FILED
2013 Sep-26  AM 09:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **LAKEISHA LEVETTE EMMITT,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 6:12-CV-1962-KOB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of the Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

## I.  INTRODUCTION

On October 6, 2009, the claimant, Lakeisha Levette Emmitt, protectively filed for supplemental security income under Title XVI of the Social Security Act. (R. 19). The claimant alleged disability commencing on January 1, 2008, because of mood swings, depression, and nervous breakdowns. (R. 134).  The commissioner denied the claims. (R. 53). The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a video hearing on May 12, 2011. (R. 38-52). In a decision dated August 9, 2011, the ALJ found that the claimant was not disabled as defined by the Social Security Act and, thus, was ineligible for supplementary security income.  (R. 19). On March 21, 2012, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  For the reasons stated below, this court affirms the decision of the Commissioner.

## II.  ISSUES PRESENTED

The claimant presents the following issues for review:

(1)     whether the ALJ properly concluded that the claimant's work as a poultry hanger
         was past relevant work;

(2)     whether the ALJ had a duty to obtain a new Global Assessment of Functioning
         score for the claimant; and

(3)     whether the ALJ properly applied the Eleventh Circuit's pain standard in
         evaluating the claimant's subjective pain.

## III.  STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must

affirm the Commissioner's decision if the Commissioner applied the correct legal standards and

if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v.*

*Apfel*, 129 F.3d 1420 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions,

including determination of the proper standards to be applied in evaluating claims." *Walker*, 826

F.2d at 999. But this court does not review the Commissioner's factual determinations *de novo*.

The court will affirm those factual determinations that are supported by substantial evidence.

"Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402

U.S. 389, 401 (1971).

This court must "scrutinize the record in its entirety to determine the reasonableness of

the [Commissioner's] factual findings." *Walker*, 826 F.2d at 999. A reviewing court must look

not only to those parts of the record that support the decision of the ALJ, but also must view the

record in its entirety and take into account evidence that detracts from the evidence on which the

ALJ relied. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV.  LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the

person cannot "engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

423(d)(1)(A).  To make this determination the Commissioner employs a five-step, sequential

evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments
> set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next
> question, or on steps three and five, to a finding of disability.  A negative answer
> to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986), 20 C.F.R. §§ 404.1520,

416.920.

In evaluating whether a claimant's work counts as past relevant work, the ALJ must

consider whether the claimant held the job within the past fifteen years; whether the job counts as

substantial gainful activity; and whether the claimant learned to do the work. 20 C.F.R. §

416.960(b)(1). Whether the claimant learned to do the work depends on the "nature and

complexity of the work." SSR 82-62, 1982 WL 31386 at *1 (S.S.A.). The claimant has the

burden to produce evidence in support of her claim. *Ellison v. Barnhart*, 355 F.3d 1272, 1276

(11th Cir. 2007). Also, the claimant must prove that she cannot perform her past relevant work. *Jackson v. Bowen*, 801 F.2d 1291, 1293 (11th Cir. 1986).

The ALJ must fully and fairly develop the record. *See Lucas v. Sullivan*, 918 F.2d 1567, 1573 (11th Cir. 1990). However, The ALJ's duty to develop the record only applies to the twelve months preceding the claimant's application for benefits and does not apply after the claimant files an application. *Ellison*, 355 F.3d at 1276.

A Global Assessment of Functioning score is a score on a scale that clinicians use to help determine a person's level of functioning. *See* American Psychiatric Assoc., Diagnostic and Statistical Manual of Disorders 32 (Text Revision 4th ed. 2000). An ALJ does not have to consider a Global Assessment of Functioning score. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006). The Commissioner does not endorse GAF scores. *Wind v. Barnhart*, 133 Fed. Appx. 684, 692 n.5 (11th Cir. 2005).

In evaluating pain and other subjective complaints, the ALJ must consider whether the claimant demonstrated an underlying medical condition, and *either* "(1) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (emphasis added); *see also Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); 20 C.F.R. § 404.1529. Subjective testimony can satisfy the pain standard if it is supported by medical evidence. *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995). The ALJ must articulate reasons for discrediting the claimant's subjective testimony. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). If the ALJ does not articulate reasons, the court must accept the claimant's

4

testimony as true. *Id.*

## V.  FACTS

The claimant has a tenth grade education and was 35 years old at the time of the administrative hearing. (R. 129, 139). Her past work experience includes working as a fast food worker and as a poultry hanger. The claimant alleges she is unable to work because of mood swings, depression, and a history of nervous breakdowns. (R. 41, 46, 48, 134).

*Mental Limitations*

On October 24, 2009, hospital personnel admitted the claimant to the Behavioral Medicine Unit (BMU) of Walker Baptist Medical Center in Jasper, Alabama for major depressive disorder and cannabinoid abuse. The claimant's medical history and physical report indicate that the claimant came to the ER stating that she heard voices telling her to walk into traffic. The claimant called the Jasper police and told them that she felt suicidal and that she was standing in the street. Dr. Kaycia Vansickle's notes indicated that the claimant stated she experienced depression the past few months, felt sad, had complications in her marriage, and felt hopeless. Hospital personnel admitted  the claimant to the hospital, and the claimant reported hearing car doors and baby's voices before she went in the street. While in the ER, the claimant reported she heard voices telling her to jump off the roof. The claimant reported a previous suicide attempt by overdose and an incident when a friend and police saved her when she laid in the street to commit suicide. (R. 233-35).

Dr. Kaycia Vansickle's notes indicate that the claimant looked anxious and disheveled; she was severely depressed and anxious; she seemed paranoid and stated she had auditory hallucinations; and she had impaired judgment and insight. Physically, Dr. Vansickle noted that

the claimant was in no acute distress. The claimant tested positive for marijuana. (R. 234)

Dr. Vansickle's discharge summary notes diagnosed the claimant with major depressive disorder with psychotic features with suicide attempts and ideation. Dr. Vanskickle's notes indicate that the claimant's major depressive disorder was "resolved at the time of discharge." At discharge, the claimant indicated that she did not have trouble with voices; she was not a danger to harm herself or others; and she thought being in the hospital and on medications helped her condition. Dr. Vansickle noted that the claimant's appetite and sleep were good, but that the claimant needed to be in outpatient therapy or she would be at imminent risk of readmission. Walker Baptist discharged the claimant on October 29, 2009, with a GAF of 50. The claimant's medications on discharge were Cogentin, Celexa, Flagyl for a urinary tract infection, Macrobid, and Navene. (R. 231-32).

On October 29, 2009, the claimant completed a function report. She stated that she cooks and cleans for her husband and herself. The claimant also reported that she cannot be around a crowd of people; she does not think clearly without her medication; and she is normally so stressed that she stays awake for days at a time. She also indicated that she changes her clothes six times a day; she takes seven baths a day; she combs her hair all the time; and she eats more than she used to. She also stated that her in-laws that live next door to her stress her out; her husband does all of their yard work because she is too tired to help; she goes outside twice a week and shops once a month; and she watches television every day and fishes once a month. (R. 141-45).

The claimant stated in her function report that she can walk three blocks before she has to rest; she loses interest in things after thirty minutes; and she follows written and spoken

6

instructions well. However, she indicated that a fast food restaurant fired her from a job because she could not get along with the manager; she does not handle stress well; she does not handle changes well; and she hears voices that scare her. (R. 146-47).

Also on October 29, 2009, the claimant completed the Social Security Administration's work history report. The claimant stated that she worked for fast food companies and as a poultry hanger. As a fast food worker, the claimant indicated that she worked thirty to forty hours per week, and as a poultry hanger, she indicated that she worked five to six days per week. As a poultry hanger, the claimant reported that she consistently lifted twenty to forty pound boxes of chicken and hung them on a production line. The claimant did not indicate how long she worked as a poultry hanger or in some of her positions as a fast food worker. (R. 149).

On October 31, 2009, the claimant's mother, Beverly A. Harris, completed a third party function report. She stated that the claimant does not care for anyone else. Ms. Harris reported that the claimant used to be able to do everything, but has not been able to do anything because of deep depression. She indicated that the claimant does dress, bathe, feed, and care for herself. She stated that the claimant watches television and fishes twice a week, but not as much as before her illness. Ms. Harris reported that the claimant cannot walk more than a block without resting for an hour and does not handle stress or changes in her routine well. However, Ms. Harris indicated that the claimant follows written and spoken instructions well, and that the claimant shops "all day sometimes." (R. 157-164).

On November 17, 2009, North Alabama Mental Health Care Center completed a treatment plan and order of services to treat the claimant for major depressive disorder. Her GAF score at the time was 37. (R. 297).

On January 12, 2010, North Alabama Mental Health Care Center completed an intake narrative for the claimant. Therapist W. M. Lyons' notes indicate that the BMU referred the claimant to the center. The claimant reported that she smoked cannabis almost daily starting at age 22. She last used cannabis on January 7, 2010. The recommended actions were group therapy twice a week for sixteen to twenty-six weeks and psychiatric appointments as scheduled. (R. 296).

On February 13, 2010, the claimant had a comprehensive psychological evaluation with psychologist Jerry Gragg, a consultative examiner for the state. Dr. Gragg's report includes a section on the claimant's statements about her condition. The claimant reported that her mother smoked marijuana and has been diagnosed with depression. She also indicated that her longest term of employment was two years at a Hardees restaurant. The claimant stated that she smokes marijuana twice a month when she is stressed out, but she denied using marijuana heavily. The claimant reported that after her hospital visit, her medication kept the voices away; she slept well; and she felt more relaxed. The claimant reported the same self-injurious behavior she reported to Walker Baptist, as well as an instance when she took rat poison and previous instances of cutting herself. (R. 248-49).

Dr. Gragg stated that the claimant had average abstract reasoning and that her judgment in hypothetical situations was fair. Dr. Gragg estimated her intellectual level in the low-average range of general intelligence. He also indicated that the claimant said her symptoms were in abatement even though she was no longer taking medication. Dr. Gragg noted that the claimant's non-verbal communication was good and did not indicate significant signs of depression, although the claimant stated she found less pleasure in previously pleasurable activities. The

8

claimant reported that she had chaotic personal relationships; she feared abandonment; she used to cut herself to relieve anxiety; and she become more angry than the circumstances of a situation indicated. (R. 249-50).

Dr. Gragg diagnosed the claimant with a single episode of major depressive disorder in partial remission not currently treated at the time of his appointment. He also stated that the claimant's documentation and presentation made him believe that the claimant has never suffered from formal thought disorder or significant anxiety disorder. Dr. Gragg concluded that the claimant's depressive disorder may have arisen from Borderline Personality Disorder, but that the claimant can work and likely would benefit from working. (R. 250-51).

On March 10, 2010, Dr. Robert M. Estock, a state agency psychiatric consultant, reviewed Dr. Gragg's record and concluded that the claimant was not significantly limited in any categories except for moderate limitations in the following areas: her ability to understand and remember detailed instructions; her ability to carry out detailed instructions; her ability to complete a normal work day or week without interruptions from psychologically based symptoms; and her ability to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Estock concluded that the claimant could carry out simple instructions in an eight hour workday with routine breaks. (R. 266-68).

On July 27, 2010, the claimant attended a psychiatric evaluation with Melissa Williams, a certified registered nurse practitioner. The claimant's problem was severe major depressive disorder with psychotic features and cannabis dependence with physically depressed mood. The notes indicate that the claimant's mother is bipolar; her father is not mentally ill; and she does not spend enough time with her brother and sister to know if they are mentally ill. The claimant

9

stated that she was married, and that her husband said he would support her. However, he did not

have a job. The claimant reported that she had not smoked marijuana in four months. The nurse

practitioner prescribed Cogentin, Abilify, and Wellbutrin. (R. 293-94).

In a September 1, 2010 case summary and statement of progress, Gwen Thomas-LeBlanc,

MS, CCS, the Director of Substance Abuse Services at Walker Baptist, indicated that the

claimant continued to struggle with her mood disorder, although she had improved. Notes state

that the claimant had a problem forgiving her mother. Regarding substance abuse, the claimant

reported she had difficulty not smoking but had not smoked in several months. (R. 281).

On September 7, 2010, the claimant attended a follow-up appointment with a Ms.

Williams, Certified Registered Nurse Practitioner at Northwest Alabama Mental Health Center.

The claimant gained weight reportedly due to inactivity and eating late. She reported being

stressed out because her husband would not look for a job. The claimant continued on Abilify,

Wellbutrin, and Cogentin. (R. 291-92).

On November 2, 2010, the claimant had another follow-up appointment with Ms.

Williams. The claimant reported that her cousin was shot and killed on October 12, 2010. The

claimant indicated that she was overwhelmed by the incident and could not sleep because of

nightmares. The claimant continued on Abilify, Wellbutrin, and Cogentin. (R. 289-90).

On November 19, 2010, Dr. Ramsey at Walker Baptist indicated that the claimant could

return to work on November 20, 2010. (R. 320).

On January 25, 2011, the claimant had another follow-up visit with Ms. Williams. Ms.

Williams' notes indicate that Ms. Williams saw the claimant on November 2, 2010, but the

claimant did not come to her December 28, 2010 appointment. Notes also indicate that the

claimant stopped taking Cogentin on November 1, 2010. The claimant reported that she was

unhappy in her marriage because her husband would not work and that she planned to leave her

husband as soon as she could find a place to live. (R. 287-88).

On February 15, 2011, a psychiatrist at Northwest Alabama Mental Health Center

completed a plan of care and order of services.[1] The plan treated the claimant for severe and

recurrent major depressive disorder with psychotic features. The claimant's level of treatment

was a level II, consisting of group therapy, an intensive outpatient group, and in-home

intervention. The claimant's Global Assessment of Function score was 37. (R. 275-77)

On March 28, 2011, a psychiatrist at Northwest Alabama Mental Health Center

performed a consultation with the claimant.[2] The claimant's listed medications were Abilify and

Wellbutrin. (R. 272-74).

After the claimant missed her April 22, 2011 appointment with Ms. Williams, the

claimant's next psychiatric evaluation was on May 10, 2011. May 10 notes indicate the claimant

was depressed because she and her husband could not conceive a child. She stated that she would

attempt to take Lithium as suggested by Dr. McLane on March 28, 2011. (R. 308-09).

On May 16, 2011, Theresa Taylor, an outpatient therapist at Walker Baptist, completed

an individual progress note. The claimant reported that Mother's Day was difficult for her

because a young child caused her to think about the children she did not have. She still wanted to

leave her husband even though he had a job. The claimant and Ms. Taylor discussed that the

claimant needed to make sure she complied with her doctor's instructions and attended medical

---

[1] A psychiatrist's signature appears in the record but is illegible.

[2] A similar signature appears in the record but is also illegible.

appointments. Notes indicate that the claimant had a depressed mood, was not suicidal, and had fair to average behavioral functioning. (R. 303).

On August 30, 2011, the claimant attended a follow-up appointment with Ms. Williams. The claimant reported that she had nightmares that seemed real, and that she felt as if everything got on her nerves. The claimant continued on Abilify and Lithium. (R. 334-35).

On September 6, 2011, Northwest Alabama Mental Health Center completed a treatment plan and order of services for the claimant. Her GAF was 44. (R. 339-40).

On October 25, 2011, the claimant attended another follow-up appointment with Ms. Williams. The claimant reported that she had trouble sleeping and woke up frequently during the night. The claimant's medications were Abilify and Lithium. (R. 342-43).

The record includes earnings reports from Marshall Durbin Food Company, where the claimant hung chickens. The claimant stated that she made $6.00 per hour at the company. (R. 151). The records show that the claimant made $282.80 in 1997; $3,731.80 in 2000; $565.25 in 2005; $246.84 in 2006; and $257.90 in 2007 from Marshall Durbin alone, in addition to money she sometimes received from other jobs. (R. 123-26).

### The ALJ Hearing

After the Commissioner denied the claimant's request for supplemental security income, the claimant requested and received a hearing before an ALJ on May 12, 2011. (R. 65-67).

On examination from the ALJ, the claimant testified that she eats once a day or not at all, does not go outside, and does not do household chores. She testified that her husband does most of the household chores because she feels like she wants to die. (R. 45).

On examination by her attorney, the claimant testified that she has gained over forty

12

pounds in the last year even though she does not eat. Also, the claimant testified that she has side effects from Lithium in that she is thirsty all the time; she has difficulty with vomiting; and she has problems with frequent urination. (R. 45-46).

Further, the claimant testified that she had suicidal thoughts on Mother's Day because she does not have children. The claimant stated that her husband had to talk her out of committing suicide. The claimant reported that she has constant mood swings. She indicated she thought she was stable for three to four days a week. The claimant stated that she does not like being around people; she has problems getting along with people when she works; she takes things the wrong way because she does not take the time to understand things; and she is paranoid that people are out to get her. (R. 45-47).

A vocational expert, Ms. Stricklin, testified concerning the classification of the claimant's past work and what skills the claimant possesses. Ms. Stricklin testified that the claimant has worked as a fast food worker and poultry hanger. Ms. Sticklin reported that fast food worker is classified as light and unskilled, and poultry hanger is classified as medium and unskilled. The ALJ then asked the vocational expert his first hypothetical. The ALJ asked if an individual with the following limitations could perform the claimant's past work: an individual of the same age, education, and work experience as the claimant; an individual who could do medium work but had moderate limitations in ability to understand, remember, and carry out simple instructions with normal work breaks in an eight hour day; an individual who could maintain concentration for two hours; an individual who could have casual, non-confrontational contact with coworkers, supervisors, and the public; and an individual who should not encounter changes in the work place suddenly. The vocational expert stated the hypothetical individual could perform the tasks

13

of a poultry hanger but not a fast food worker. (R. 47-49).

The ALJ then gave Ms. Stricklin a second hypothetical. The ALJ asked what the vocationally acceptable level of breaks and absences would be for an individual with all of the limitations of the first hypothetical, but the ALJ added that the individual would also need breaks in an eight-hour day and occasional days off. The vocational expert stated that the hypothetical individual should have no more than three breaks in a day totaling one hour and should not miss more than ten to fifteen working days per year. (R. 49-50).

Finally, the ALJ gave a third hypothetical to the vocational expert. In this hypothetical, the ALJ asked the vocational expert if a hypothetical person with the same limitations in hypothetical one, with added limitations of nausea, sleepiness, weakness, and fatigue from medication and the need for one therapy session per month could perform the claimant's previous work. The vocational expert stated that the therapy was not a problem and that the medical side effects would not be a problem unless they rose to moderately severe and were on a chronic and sustained basis. The ALJ asked if the moderately severe side effects came about, if the assessment would be the same as the assessment for hypothetical two.  The vocational expert stated that if the hypothetical person's side effects were moderately severe, the person would not be able to work. (R. 50-51).

*The ALJ's Decision*

On August 9, 2011, the ALJ issued a decision finding the claimant was not disabled under the Social Security Act. (R. 19).  First, the ALJ found that the claimant had not engaged in substantial gainful activity since January 1, 2008, her onset date. (R. 21).

Second, the ALJ found that the claimant suffered from three severe impairments:

14

depression, borderline personality disorder, and cannabinoid abuse. The ALJ stated that the claimant's impairments were more than minimal functional limitations, and that the medical records established that the claimant's limitations had continued for more than twelve months. The ALJ noted that the claimant was diagnosed and received treatment for her impairments. (R. 21).

Third, the ALJ found that the claimant did not have an impairment or combination of impairments that meets or medically equals a listing. The ALJ stated that the claimant had not specifically alleged a listing level impairment but considered the listings anyway. In determining that the claimant did not have a listing level impairment, the ALJ considered "paragraph B" criteria. She stated that to meet paragraph B the claimant must have at least two of a marked restriction of activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. The ALJ stated that a marked limitation is more than moderate but less than severe, and an extended duration means three episodes within one year or an average of once every four months, each at least two weeks in duration. (R. 22).

In analyzing whether the claimant has a marked restriction of activities of daily living, the ALJ determined that the claimant's difficulty was mild because the claimant's testimony did not indicate that she was incapable of doing household chores, laundry, and cooking. Instead, the ALJ noted that the claimant testified that she isolates herself because she does not want to be bothered. (R. 22).

The ALJ also stated that the claimant's difficulties are mild when considering whether she has a marked difficulty maintaining social functioning. The ALJ based his decision on the

claimant's testimony and her mother's report. The ALJ stated that the claimant testified that she stays at home because she is paranoid and feels people are out to get her. The claimant's mother said the claimant's main mode of transportation is walking because "she has no care" and that claimant feels like she does not fit in. (R. 21-22).

The ALJ found that the claimant's concentration and persistence or pace limitations are moderate. The ALJ based this decision on Dr. Gragg's report. The ALJ summarized Dr. Gragg's findings and concluded that Dr. Gragg's report showed no intellectual or psychological features that precluded the claimant from working. (R. 23).

The ALJ next considered that the claimant only had one of two necessary episodes of decompensation. The ALJ determined that the claimant experienced one episode of decompensation of an extended duration. The ALJ noted the claimant's hospital visit from her attempted suicide on October 24, 2009. However, the ALJ reasoned that Dr. Gragg's report, dated three months after the incident, stated that the claimant believed she was better and no longer heard voices. The ALJ noted that Dr. Gragg explicitly stated that his assessment should not be taken as a statement that the claimant could not work. Instead, the ALJ noted that Dr. Gragg stated it would likely help the claimant if she worked.  The ALJ concluded that because the claimant only had one episode of decompensation, she did not meet the requirement of two episodes. (R. 23).

After rejecting the paragraph B criteria, the ALJ considered the Paragraph C criteria. The ALJ reasoned that the claimant did not meet the paragraph C criteria because she had no history of requiring a highly-supportive living environment or an inability to function outside her home. (R. 24).

16

The ALJ found that the claimant had the residual functional capacity to perform medium work. Applying the Eleventh Circuit's pain standard, the ALJ concluded that the claimant's impairments could cause the alleged symptoms, but the claimant's statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible because the claimant's statements were not consistent with the objective medical evidence. To support his conclusion, the ALJ first considered the claimant's potential substance abuse. He reasoned that no evidence exists in the record that establishes that the claimant's marijuana use is the sole contributor to her illnesses. He referenced that the reviewing medical source, Dr. Estock, who found that the claimant did not have more than moderate limitations of concentration, persistence, and pace. The ALJ also referenced the claimant's ongoing treatment records as evidence that the claimant reports a reduction in her substance abuse problem. (R. 25).

Next, the ALJ reasoned that the claimant's testimony that she was no longer on her medications because she cannot afford them is not consistent with the medical record. The ALJ noted that treatment records from North Alabama Medical Health Center show that the claimant continued to receive her medications. The ALJ reasoned that the claimant's increase in depressive symptoms was likely due to her marital problems and her cousin's death. (R. 25)

Regarding the opinion evidence, the ALJ stated that he gave significant weight to the state agency non-examining consultant, Dr. Estock. The ALJ reasoned that Dr. Estock's opinions were consistent with the medical records at the time and the subsequent medical records. He reasoned that Dr. Estock stated the claimant can carry out simple work tasks in an eight-hour day if she had routine breaks. The ALJ pointed out that Dr. Estock concluded that the claimant could handle interactions with co-workers and could handle changes that are slowly introduced. (R.

17

26).

The ALJ also stated that he gave significant weight to Dr. Gragg's opinions. The ALJ reasoned that Dr. Gragg personally examined the claimant and his opinions are consistent with the record as a whole. (R. 26).

The ALJ gave little weight to the claimant's mother's opinion. The ALJ stated that the mother's opinions are not supported by the evidence of claimant's physical limitations and are inconsistent with the mother's own report that the claimant sometimes shops all day. (R. 26).

The ALJ concluded that the claimant could return to her previous work as a fast food worker and poultry hanger. The ALJ noted that fast food worker is classified as light and unskilled, and poultry hanger is classified as medium and unskilled. The ALJ relied on the vocational expert's testimony to establish that the claimant could perform her past work. The ALJ stated that the vocational expert testified that an individual of the same age, education, work experience, and residual functional capacity could work as a fast food worker and poultry hanger. Thus, the ALJ found that the claimant's residual functional capacity was high enough to perform her previous jobs as they are generally performed. (R. 26).

The ALJ concluded that the claimant was not under a disability under the Social Security Act. (R. 26)

## VI.  DISCUSSION

### A.  Past Relevant Work

The Commissioner concedes that the ALJ erroneously stated in his decision that the Vocational Expert, Ms. Stricklin, testified that the claimant could perform her past relevant work as a fast food worker. Commissioner's Br. 9 n.3. When an ALJ makes an erroneous factual

18

finding about the record, the error is harmless if the remaining evidence provides a substantial basis for the ALJ's conclusion. *See Brown v. Commissioner of Social Sec.*, 459 Fed. Appx. 845 (11th Cir. 2012) (holding that although the ALJ erroneously found that claimant had not sought treatment for her mental health issues over an eighteen-year period, this error was harmless because the remaining evidence provided a substantial basis for the ALJ's conclusion denying claimants disability application); *see also Colon ex rel. Colon v. Commissioner of Social Sec.*, 411 Fed. Appx. 236 (11th Cir. 2011) (finding that any error by the ALJ in mischaracterizing the vocational expert's testimony about claimant's former work and failing to pose hypothetical that included all of the claimant's limitations was harmless, given that substantial evidence supported that applicant could perform his former work as he actually performed it). In this case, Ms. Stricklin actually testified that the claimant could not perform her past work as a fast food worker. (R. 49). However, because Ms. Stricklin did identify other past relevant work that claimant could perform, namely, poultry hanger, substantial evidence still exists to support the ALJ's decision.

The claimant argues that the ALJ improperly decided that the claimant could perform her past relevant work as a poultry hanger. To the contrary, this court finds that the ALJ correctly considered poultry hanger as relevant work and that substantial evidence supports his decision.

Past relevant work includes jobs that the claimant held within the past fifteen years that constitute substantial gainful activity and that the claimant learned to do. 20 C.F.R. § 416.960(b)(1). The amount of time to learn a particular job depends on the "nature and complexity of the work." SSR 82-62, 1982 WL 31386 at *1 (S.S.A.). The claimant has the burden to produce evidence to support her claim. *Ellison*, 355 F.3d at 1276. The claimant

specifically bears the burden to prove that she cannot perform her past relevant work. *Jackson*, 801 F.2d at 1293. In this case, the ALJ relied on his determination that the claimant can perform her past relevant work. He did not give examples of what other types of work the claimant could perform if she could not perform her past relevant work. (R. 26).

First, the claimant's work as a poultry hanger satisfies the first prong of past relevant experience. The claimant worked as a poultry hanger for Marshall Durbin in 2007. Second, adequate evidence exists in the record for the ALJ to conclude that the claimant learned the job of poultry hanger. The Commissioner argues that the claimant's job as a poultry hanger qualifies as past relevant work based on the claimant's earnings reports. Commissioner's Br. 12. The claimant's earnings reports show that she worked for Marshall Durbin in 1997, 2000, 2005, 2006, and 2007. In 2000, the claimant posted earnings at Marshall Durbin of $3,371.80. (R. 123-26). Additionally, the Vocational Expert testified that the claimant could perform her past work as a poultry hanger. Because of the claimant's earnings reports and vocational expert testimony, sufficient evidence exists in the record to establish that the claimant can perform her past relevant work.

Based on the record taken as a whole, this court concludes that the ALJ properly found that the claimant's work as a poultry hanger was past relevant work and that substantial evidence supports his decision.

## B.  Full and fair record (updated GAF records)

The claimant argues that the ALJ did not fully and fairly develop the record because he did not obtain updated GAF scores for the claimant. Claimant's Br. 13-14. To the contrary, this court finds that the ALJ did not have a duty to obtain an updated GAF score and that GAF scores

are not endorsed by the Commissioner as a way to determine if a claimant is disabled.

An ALJ has a duty to fully and fairly develop the record. *See Lucas*, 918 F.2d at 1573. However, the ALJ only has a duty to develop the record for the twelve months *preceding* the claimant's application for benefits. *Ellison*, 355 F.3d at 1276. The ALJ does not have to develop the record after the claimant files an application. *Id.*; 20 C.F.R. §§ 404.1512(d), 416.912(d).

A GAF score is a score on a scale that clinicians use to help determine a person's level of functioning. *See* American Psychiatric Assoc., Diagnostic and Statistical Manual of Disorders 32 (Text Revision 4th ed. 2000). GAF scores are not endorsed by the Commissioner for use in Social Security and SSI disability programs. *Wind*, 133 F. App'x at 692 n.5. An ALJ may disregard a GAF score even if it is received. *See Kornecky*, 167 F. App'x. at 511.

Because the ALJ has no duty to develop the record after the date the claimant files and the claimant herself has the burden to produce evidence to support her claim, the ALJ had no duty to update the record with the claimant's GAF score. In addition, a GAF score cannot be determinative because an ALJ may disregard a GAF score even if it is received. *See Kornecky*, 167 F. App'x. at 511.

Based on the record taken as a whole, this court concludes that the ALJ did not have a duty to obtain an updated GAF score for the claimant.

## C.  The Eleventh Circuit's Pain Standard

The claimant argues that the ALJ did not properly account for the claimant's need for breaks and absences from work. Claimant's Br. 13-14. To the contrary, this court finds that the ALJ properly applied the pain standard in evaluating the claimant's subjective testimony.

In evaluating pain and other subjective complaints, the ALJ must consider whether the

claimant demonstrated an underlying medical condition, and *either* "(1) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain." *Holt*, 921 F.2d at 1223 (emphasis added); *see also Wilson*, 284 F.3d at 1221; 20 C.F.R. § 404.1529. Subjective testimony can satisfy the pain standard if it is supported by medical evidence. *Foote*, 67 F.3d at 1561. The ALJ must articulate reasons for discrediting the claimant's subjective testimony, and if he does not, the court must accept the claimant's testimony as true. *Brown*, 921 F.2d at 1236. The claimant has the burden to produce evidence to support a claim. *Ellison*, 355 F.3d at 1276.

In her brief, the claimant asserts that she would require more than fifteen days off of work per year and more than three breaks in a day. However, the ALJ stated that no objective medical evidence exists that establishes that the claimant would require such excessive breaks. None of the claimant's doctors stated that she would need more breaks than a normal employee. Also, the claimant did not testify that she required excessive breaks from work. Instead, Dr. Estep concluded that the claimant could work for eight hours with regular breaks. (R. 25)

Because the claimant did not submit objective medical evidence and the ALJ articulated that the claimant's subjective testimony is not supported by the medical evidence, the ALJ properly discounted the claimant's subjective testimony. (R. 25).

## VII.  CONCLUSION

For the reasons above stated, this court concludes that the decision of the Commissioner is supported by substantial evidence and is to be AFFIRMED.  The court simultaneously will enter a separate order to that effect.

DONE and ORDERED this 26th day of September, 2013.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE